## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| T-MOBILE USA, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No: _____ |
| v. | ) ) | |
| RYAN T. BOYLE, JOHN DOES 1-10, and XYZ COMPANIES 1-10, | ) ) ) | |
| Defendants. | ) ) ) | |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff T-Mobile USA, Inc., a Delaware corporation ("T-Mobile"), hereby files this Complaint for Damages and Injunctive Relief, and sues Defendants Ryan T. Boyle, John Does 1-10, and XYZ Companies 1-10 (collectively "Defendants"), and states:

## INTRODUCTION AND BACKGROUND

1.      This is an action for damages and injunctive relief arising out of Defendants' unlawful business enterprises that defraud and willfully infringe T-Mobile's trademark and other rights related to T-Mobile's prepaid wireless service, including but not limited to its special FlexPay service ("FlexPay"), T-Mobile's specially-manufactured wireless telephones designed for use with T-Mobile's  wireless service, and related activation materials.

2.      As set forth in greater detail below, Defendants are engaged in, and knowingly facilitate and encourage others to engage in, unlawful business practices involving the unauthorized and unlawful purchase, activation, and resale of T-Mobile Subscriber Identity Module ("SIM") cards for use on T-Mobile's FlexPay service, and the sale of the confidential and proprietary codes necessary for such activations (the "FlexPay Fraud Scheme"), as well as

the unauthorized and unlawful bulk purchase and resale of T-Mobile prepaid wireless telephones ("Prepaid Phones" or "Phones"), unauthorized and unlawful computer unlocking of T-Mobile Prepaid Phones, alteration of proprietary software computer code installed in the Phones for T-Mobile, and trafficking of the Phones and SIM cards for profit (the "Subsidy Theft Scheme").

3.      Defendants perpetrate their FlexPay Fraud Scheme by acquiring large quantities of T-Mobile SIM cards and/or, using confidential T-Mobile codes and elaborate fraudulent schemes to activate those SIM cards on T-Mobile's FlexPay service and/or sell the codes and fraudulent scheme.   Defendants then falsely advertise to the public that the SIM cards, which Defendants have loaded with illegally-acquired airtime minutes, are authentic T-Mobile SIM cards properly activated for use with T-Mobile's FlexPay wireless service and/or that unlimited T-Mobile airtime can be obtained for the cost of a code.

4.      The FlexPay Fraud Scheme is part of the larger Subsidy Theft Scheme, in which Defendants acquire large quantities of T-Mobile Prepaid Phones from retail stores such as Wal-Mart and Target, and solicit others to purchase T-Mobile Prepaid Phones in large quantities for the benefit of Defendants.   Upon information and belief, Defendants remove the T-Mobile Prepaid Phones' original packaging and accessories, including copies of the written warranties and ownership manuals, sell the SIM cards for fraudulent activation as part of the FlexPay Fraud Scheme, and ship the Phones overseas, unlocked or to be unlocked, for resale.

5.      Defendants acquire the T-Mobile Prepaid Phones with the knowledge and intent that the Phones will not be activated for use on the T-Mobile prepaid wireless network.   Instead, the Phones are computer-hacked.   The purpose of this hacking, known as "unlocking," is to disable software installed in the Phones by the manufacturers at the request and expense of T-Mobile, which enables the activation of the T-Mobile Prepaid Phones exclusively on T-Mobile's

wireless network.  The purpose of the software is to allow T-Mobile to offer the Prepaid Phones at a discount to the consumer while protecting T-Mobile's subsidy investment in the Phone. Upon information and belief, the illegally unlocked Phones are trafficked and resold as new by Defendants, at a premium, under the T-Mobile trademarks.  Additionally, the SIM cards packaged with the Prepaid Phones are used and sold by Defendants in the FlexPay Fraud Scheme.

6.     T-Mobile permits its legitimate customers to unlock their Prepaid Phones upon request and if certain conditions are satisfied, including prior activity on the Phones.  Defendants and others who seek to improperly unlock Prepaid Phones for the purpose of illicitly profiting from their fraudulent resale are prohibited from doing so.

7.     In an effort to prevent the Subsidy Theft Scheme, T-Mobile retailers have, at T-Mobile's direction, implemented policies limiting the number of T-Mobile Prepaid Phones an individual may purchase on a daily basis.  Defendants, through their Subsidy Theft Scheme, have taken steps to circumvent these policies by, among other things, employing large numbers of "Runners" to make multiple purchases of T-Mobile Prepaid Phones on behalf of Defendants.

8.     In an effort to prevent the FlexPay Fraud Scheme, T-Mobile directs its retailers to keep confidential the codes and identifiers necessary to activate SIM cards on T-Mobile's FlexPay service.  Nonetheless, Defendants improperly obtain, retain, sell, and/or use these codes and identifiers to fraudulently activate SIM cards on T-Mobile's FlexPay service, thereby stealing airtime from T-Mobile.  Defendants provide false information through the internet and/or over the phone to complete the fraudulent activation of the SIM cards.

9.      Defendants' conduct, including that of currently unknown civil and criminal co-conspirators, is causing T-Mobile to suffer substantial losses, and has caused immediate and irreparable injury to T-Mobile and the T-Mobile trademark.

## PARTIES, JURISDICTION AND VENUE

10.      This is an action for damages in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees.

11.      T-Mobile is a Delaware corporation, with its principal place of business in Bellevue, Washington.

12.      Defendant Ryan T. Boyle ("Boyle") is an individual.   Upon information and belief, Boyle is a resident of Illinois and has conducted business, and continues to conduct business, in Illinois.   Upon information and belief, Boyle resides and conducts business at 315 Ridge Road, Barrington, IL 60010-2331.

13.      Upon information and belief, yet to be identified John Does 1-10 participating in the Subsidy Theft and FlexPay Fraud Schemes are present and/or doing business in Illinois, and are subject to the jurisdiction of this Court.   The identities of the various John Doe Defendants are not presently known, and this Complaint will be amended to include the name or names of these individuals when such information becomes available.

14.      Upon information and belief, yet to be identified XYZ Companies 1-10 participating in the Subsidy Theft and FlexPay Fraud Schemes, through their agents, servants, and employees, are present and/or doing business in Illinois and are, or shall be, subject to the jurisdiction of this Court.   The identities of such Defendants are not presently known, and this Complaint will be amended to include the names of the actual Defendants when such information becomes available.

15.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1332, and 1338 because T-Mobile's claims for violations of the United States Trademark Act under Title 15 of the United States Code, and violations of the Computer Fraud and Abuse Act under 18 U.S.C. § 1030 arise under federal law, and because T-Mobile and Defendants are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest, fees, and costs. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over T-Mobile's state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

16.     This Court has personal jurisdiction over the Defendants because they regularly transact business in the State of Illinois, reside and own real property in the State of Illinois and/or committed tortious acts within the State of Illinois.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this District and a substantial part of the events or omissions giving rise to the claims occurred in this judicial District.

## T-MOBILE'S BUSINESS MODEL

18.     Based in Bellevue, Washington, T-Mobile USA, Inc., is a member of the T-Mobile International group, one of the world's leading companies in mobile communications, and is the United States mobile telecommunications subsidiary of Deutsche Telekom AG.

19.     Approximately 151 million mobile customers are served by companies of the Deutsche Telekom group — nearly 34 million by T-Mobile USA — all via a common innovative technology platform based on GSM, the world's most successful digital wireless standard. Multiple independent research studies rank T-Mobile highest, in numerous regions throughout the United States, in wireless customer care.  T-Mobile highly values the outstanding business reputation it has worked hard to develop.

20.     T-Mobile's prepaid program enables its customers to prepay for their wireless service by purchasing T-Mobile airtime cards and specially-manufactured wireless Phones.  The SIM cards that come with the Prepaid Phones often provide free introductory minutes that are available upon activation.  Customers are able to load refill airtime into their T-Mobile Prepaid Phones using codes generated from PIN numbers found on the airtime cards in order to use their Phones on T-Mobile's wireless network.  In addition to being available through T-Mobile online and in its stores, T-Mobile Prepaid Phones and airtime cards are sold through major national retailers such as Wal-Mart and Target.  T-Mobile Prepaid Phones function both in the United States and abroad.

21.     T-Mobile's business model is based upon T-Mobile's ability to deliver an affordable product to its consumers.  Therefore, T-Mobile subsidizes its customers' acquisition of the T-Mobile Prepaid Phones by selling its Phones for substantially less than the Phones cost T-Mobile.  T-Mobile recoups this subsidy through profits earned on the sale of the T-Mobile prepaid airtime cards that are required to make and receive calls on the T-Mobile Prepaid Phones.  T-Mobile is able to offer its Prepaid Phones to customers at reduced prices only if the Phones are used as intended on the T-Mobile prepaid wireless network.

22.     Manufacturers that produce wireless phones for T-Mobile install proprietary software, requested and paid for by T-Mobile, into the T-Mobile Prepaid Phones.  The T-Mobile software locking devices prevent T-Mobile Prepaid Phones from being used without loading airtime minutes from a T-Mobile prepaid airtime card.

23.     T-Mobile's FlexPay program similarly allows consumers to purchase cellular phone service without a term contract, deposit or activation fee.  However, under the FlexPay program, to obtain service, consumers purchase a T-Mobile phone from T-Mobile or from an

authorized dealer, pay for the first month of service, and then pay in advance for their service on a monthly basis.

24.     T-Mobile's SIM cards and FlexPay program are available only through T-Mobile online, T-Mobile's stores, or through authorized T-Mobile dealers.  Activation on the FlexPay program is accomplished through the use of confidential and proprietary online tools or through providing confidential codes to a T-Mobile customer service representative.

25.     Authorized T-Mobile dealers who enroll customers in T-Mobile's FlexPay program receive a commission as part of their compensation.  Specifically, when a new line of FlexPay service is activated through an authorized T-Mobile dealer, the T-Mobile dealer is permitted by T-Mobile to retain the customer's first monthly payment as a commission.  After the first payment, the customer remits his or her monthly payments directly to T-Mobile.

## T-MOBILE'S TRADEMARK RIGHTS

26.     Deutsche Telekom AG owns the standard character mark T-Mobile and a stylized T-Mobile Mark (collectively, the "T-Mobile Marks") as depicted below:



27.     As a wholly-owned subsidiary of Deutsche Telekom AG, Plaintiff has been assigned the right to use the T-Mobile Marks and obtained the right to enforce said rights.

28.     Plaintiff uses the T-Mobile Marks on and in connection with telecommunications services and products, including on Phones and SIM cards.

## DEFENDANT'S MISCONDUCT

29.     T-Mobile has discovered that although large quantities of its Prepaid Phones are being purchased at retailers throughout the United States, a significant number of these Phones are not being activated for use on the T-Mobile network.

30.     Instead, entities and individuals, such as Boyle, are purchasing and fraudulently reselling T-Mobile Prepaid Phones in bulk quantities.  The Phones are taken out of their original packaging and "unlocked," then all accessories, warranties, manuals, and SIM cards are removed, and, upon information and belief, the Phones are shipped overseas and sold.  The SIM cards are used for the Flex Pay Fraud Scheme.  Defendant undertakes these actions for profit; not for the sole purpose of lawfully connecting to a wireless telephone communication network.

31.     Once a T-Mobile Phone has been unlocked, it is operable on other wireless networks.  T-Mobile no longer has a revenue source to recoup the invested subsidy on that Prepaid Phone.

32.     It is well known that T-Mobile does business worldwide.  In addition to its program "World Class International Service," T-Mobile's website sets forth international roaming rates for T-Mobile Prepaid Phones and for postpaid phones.  Additionally, T-Mobile offers mobile phones for rent to specific international destinations.  T-Mobile has substantial and well-deserved goodwill and a hard earned reputation for providing excellence in wireless products and services that are internationally recognized.

33.     Upon information and belief, Defendant Boyle, along with others, conspire and work in concert to deceive retailers and circumvent retailers' policies limiting the number of T-Mobile Prepaid Phones an individual may purchase.

34.     Similarly, T-Mobile has learned that a significant number of T-Mobile SIM cards containing the T-Mobile Marks are being fraudulently activated on the T-Mobile FlexPay program.

35.     Defendants and/or their agents purchase T-Mobile SIM cards in bulk and fraudulently activate the SIM cards by calling T-Mobile or connecting with T-Mobile's online activation system, posing as legitimate T-Mobile dealers, and providing improperly obtained

and/or retained activation codes and improperly obtained or fraudulent information about the "customer" for whom the FlexPay account is to be activated. Defendants and their co-conspirators then sell these fraudulently activated SIM cards and/or proprietary activation codes to the public -- either before or after activation -- by misrepresenting that the SIM cards are authentic, that they have been or will be legitimately activated on the T-Mobile FlexPay program, and that they contain a certain amount of "free" (or even "unlimited") airtime, and/or that the dealer codes are a legitimate means of obtaining airtime.

36.     By providing fraudulent information and posing as a legitimate T-Mobile dealer and/or improperly using confidential dealer codes, Defendants defraud T-Mobile into believing a legitimate customer has signed up for FlexPay service. In reliance on this seemingly legitimate, though fraudulent information, T-Mobile activates the T-Mobile SIM card for use on the T-Mobile FlexPay program. Defendants and/or their co-conspirators then sell the fraudulently activated SIM card and/or fraudulent dealer codes to consumers, who use the SIM card and/or dealer codes to access T-Mobile's telecommunications network. The SIM card is active on the FlexPay program for one month, as the fraudulent information Defendants provide to T-Mobile indicates that the "customer" has already paid the T-Mobile dealer for the first month of T-Mobile FlexPay service. After the "customer" fails to pay T-Mobile for the following month's service, the SIM card is deactivated.

37.     Each time a SIM card is fraudulently activated, Defendants and their co-conspirators are defrauding T-Mobile into providing one month's worth of service with no remuneration. Defendants and their co-conspirators are also defrauding the individuals who purchase these fraudulent SIM cards into believing that they are receiving an authentic T-Mobile SIM card that was endorsed by T-Mobile for use on its FlexPay program, when in fact, they are not.

38.     Defendant Ryan Boyle systematically and regularly procures and fraudulently sells T-Mobile proprietary activation codes to fraudulently activate T-Mobile SIM cards. Boyle regularly advertises these proprietary activation codes on internet sites such as www.ebay.com using the T-Mobile name in his advertisements. A print-out evidencing one of Boyle's advertisements is attached hereto as **Exhibit A**. Further, as part of the sale, Boyle provides a detailed description of how to utilize the codes and SIM cards to maximize the fraud against T-Mobile. A print-out of a communication from Boyle laying out the procedure for maximizing the fraud is attached hereto as **Exhibit B**[1]. As reflected in Boyle's instructions in **Exhibit B**, he continues to adjust his process to attempt to overcome each security obstacle that T-Mobile implements to thwart his ongoing theft.

39.     Boyle also has recruited a web of co-conspirators around the country to facilitate the trafficking of T-Mobile activation codes and the fraudulent activation of SIM cards through the improper use of those codes. Boyle and his co-conspirators' use and trafficking of stolen activation codes and SIM cards over the internet and throughout the United States and fraudulent activation of the SIM cards, substantially affects interstate commerce.

### SUBSTANTIAL HARM CAUSED BY DEFENDANTS' MISCONDUCT

40.     As to the Subsidy Theft Scheme, Defendants' actions substantially harm T-Mobile by depriving it of the opportunity to recoup its losses on the sale of its T-Mobile Prepaid Phones and to earn profits by providing wireless service to legitimate T-Mobile consumers.

41.     Similarly, removing the Prepaid Phones from the original packaging and altering the Phones irreparably harms T-Mobile because it deprives T-Mobile of the means to control the quality of its product.

42.     The conduct of Defendants, their co-conspirators, and others who engage in the

---

[1] Portions of this Exhibit are redacted as they describe in specific detail how to defraud T-Mobile, and, as such, are highly confidential and could be extremely detrimental to T-Mobile. T-Mobile will file the unredacted version under seal with the Court, if requested.

unlawful bulk purchasing, unlocking, and sale of unlocked and altered T-Mobile Prepaid Phones has resulted in shortages of available T-Mobile Prepaid Phones, thereby substantially harming T-Mobile and its relationship with retailers and consumers because T-Mobile is not able to supply retailers with sufficient handsets to satisfy the demand from legitimate consumers.  As a result, T-Mobile is losing potential consumers to wireless competitors.

43.     Defendants' actions substantially harm T-Mobile and consumers who ultimately purchase T-Mobile handsets that have been improperly unlocked and repackaged.  As a result of the Defendants' actions, the Phones no longer carry the manufacturer's warranty.  Accordingly, the T-Mobile Prepaid Phones resold by Defendants differ materially from the genuine T-Mobile Prepaid Phones sold by authorized T-Mobile dealers, all of which carry a manufacturer's warranty. Moreover, consumers of the unlocked wireless phones are misled as to the source, sponsorship and origin of their unlocked wireless phone and may be unable to obtain warranty service in the event they experience problems with their Phones.  As a result, T-Mobile's reputation suffers further.

44.     Further, Defendants' improper and unauthorized resale of T-Mobile Prepaid Phones for use on other networks but still bearing the T-Mobile Marks may result in calls by confused consumers to T-Mobile's customer relations department.  T-Mobile incurs substantial costs associated with such calls and its reputation is further damaged because T-Mobile may be unable to assist those consumers since Defendants' actions voided the warranties and because Defendants sold the Phones for use on another provider's network, for which the Phones may not be compatible.  These problems do not exist for legitimate T-Mobile customers who legitimately unlock their Phones.

45.     Defendants use SIM cards from Phones purchased for the Subsidy Theft Scheme to facilitate the FlexPay Fraud Scheme; thereby compounding the harm to T-Mobile.  The Subsidy

Theft Scheme and the FlexPay Fraud Scheme are, thus, related and inter-dependent with one another.

46.     In relation to the FlexPay Fraud Scheme, the actions of Defendant Boyle and his co-conspirators substantially harm T-Mobile by, among other things, defrauding T-Mobile into providing airtime without receiving compensation, by causing T-Mobile to incur the cost of paying a third-party carrier for any overseas calls made using the fraudulently activated SIM cards and the cost of hiring personnel to redress and try to prevent Defendant's fraud, and by depriving T-Mobile of the opportunity to earn profits by providing wireless service to legitimate T-Mobile consumers.

47.     The fraudulent activation of wireless service accounts by Defendants and their co-conspirators irreparably harms T-Mobile because it deprives it of the means to control the quality of its product.

48.     Defendants' actions substantially harm T-Mobile and consumers who purchase their fraudulently-activated T-Mobile SIM cards or activation codes for use with the FlexPay program because they are misled as to the source, sponsorship, and origin of the products, and as to the legitimacy and amount of airtime they will be receiving.

49.     Because Defendants sell fraudulently-activated T-Mobile SIM cards and activation codes that Defendants claim provide "unlimited" airtime, unsuspecting consumers who purchase Defendants' products often blame T-Mobile when their service is deactivated and they learn they must purchase additional airtime to refill the SIM card and re-activate it after the original thirty days.   As a result, T-Mobile's reputation is further harmed by Defendants' conduct.

50.     Similarly, Defendants' improper and unauthorized resale of T-Mobile SIM cards—which still bear the T-Mobile Marks—for use with the FlexPay program results in calls by confused and angry consumers to T-Mobile's customer relations department, for which T-

Mobile incurs substantial costs.  T-Mobile's reputation is further damaged because T-Mobile may be unable to assist those consumers because Defendants makes false representations to consumers that they have paid for a particular level or amount of T-Mobile service.  These problems do not exist for customers who receive legitimate T-Mobile services.

51.     Defendants' and their co-conspirators' conduct has resulted in the dilution of the T-Mobile Marks, substantial harm to T-Mobile's business reputation and goodwill and a greater likelihood of confusion, mistake, and deception as to the origin of T-Mobile products unlawfully sold by the Defendants and their co-conspirators and as to the relationship between T-Mobile and Defendants.

## CIVIL PROCEEDINGS IN OTHER FEDERAL COURTS

52.     Federal courts have recognized that conduct similar to Defendants' conduct here violates existing law.

53.     In addition to T-Mobile, TracFone Wireless, Inc. ("TracFone"), Nokia Corporation ("Nokia"), AT&T Mobility LLC ("AT&T"), and Virgin Mobile USA, LLC ("Virgin Mobile") have filed lawsuits in numerous federal courts across the country against other defendants similarly engaged in the practice of defrauding legitimate consumers by bulk purchasing prepaid wireless telephones and hacking, repackaging, and reselling the counterfeit prepaid wireless phones and fraudulently-activated SIM cards for profit.

54.     T-Mobile, AT&T, TracFone, Nokia, and Virgin Mobile have obtained Final Judgments and Permanent Injunctions in these cases, examples of which are attached hereto as **Composite Exhibit C**.  A defendant who failed to abide by an injunction issued by the United States District Court for the Southern District of Texas pled guilty to criminal contempt and was sentenced to serve 57 months in prison.  The sentence was subsequently affirmed by the U.S.

Fifth Circuit Court of Appeals.  Copies of the Memorandum Opinion and Order of Contempt, Application for Criminal Contempt, the Order finding cause to believe the defendant is guilty of criminal contempt, Judgment of Criminal Contempt, and Order Affirming the Judgment are attached hereto as **Composite Exhibit D**.

<u>**COUNT ONE**</u>

**FEDERAL TRADEMARK INFRINGEMENT
AND FALSE ADVERTISING
15 U.S.C. § 1125 (a)(1)(A) and (B) [§43(a) of the Lanham Act]**

T-Mobile reasserts and incorporates the factual allegations set forth above as though fully set forth herein.

55.     Defendant's and/or his co-conspirators' aforementioned conduct  constitutes use of the T-Mobile Marks without authorization in connection with their conspiracy to sell and offer for sale unlocked, counterfeit T-Mobile Prepaid Phones, T-Mobile services, and T-Mobile SIM cards that have been fraudulently activated on the T-Mobile FlexPay service, which customers will discover have been altered from their original state and do not include the warranties, accessories, manuals and related items that constitute part of the T-Mobile Prepaid Phone package and are not legitimately active T-Mobile SIM cards.

56.     Defendant's and/or his co-conspirators' use of the T-Mobile Marks in connection with the sale of unlocked, counterfeit T-Mobile Phones, T-Mobile codes and services, and fraudulently activated SIM cards has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' counterfeit products and services, and the relationship between T-Mobile and Defendants.

57.     Defendant and/or co-conspirators' unauthorized use of the T-Mobile Marks is likely to continue in the future, all to the great and irreparable damage to the business, reputation, and goodwill of T-Mobile.

58.     Defendants' and/or their co-conspirators' use of the T-Mobile Marks in connection with the unlocked, counterfeit T-Mobile Phones, T-Mobile codes and services, and the sale of fraudulently activated T-Mobile SIM cards, which do not include warranties, constitutes a misappropriation of the distinguishing and identifying T-Mobile Marks that were created as a result of significant effort and expense.   Defendants' and/or their co-conspirators' use of the T-Mobile Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with T-Mobile, and, thus, constitutes false designation of origin and is likely to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved, or sanctioned by T-Mobile.

59.     Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, T-Mobile and the reputation and goodwill of T-Mobile, and each has unjustly enriched and will continue to unjustly enrich him, her, or itself at the expense of T-Mobile.   T-Mobile is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are enjoined from committing and continuing to commit such acts.

60.     Defendants' use of the T-Mobile Marks in commercial advertising or promotion misrepresents the nature, characteristics, and/or qualities of their infringing products and services. Defendants' advertising and promotion is false or misleading.   Defendants' advertising and promotion deceives, or has the capacity to deceive consumers.   The deception and misrepresentations has a material effect on purchasing decisions and affected interstate commerce.

61.     Defendants' activities constitute false designation of origin, false descriptions and representations, and false advertising in commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A) and (B).

62.     T-Mobile is entitled to appropriate relief as prayed for hereinafter, including injunctive relief.

63.     Defendants knew or should have known that T-Mobile is the exclusive licensee of the T-Mobile Marks and that Defendants had no legal right to use the T-Mobile Marks on their infringing products and services.   Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, so as to justify the assessment of exemplary damages and an award of Plaintiff's lost profits, Defendants' profits, and Plaintiff's attorneys' fees.

## COUNT TWO

## CONTRIBUTORY TRADEMARK INFRINGEMENT

T-Mobile reasserts and incorporates the factual allegations set forth above as though fully set forth herein.

64.     By misappropriating and using the T-Mobile Marks in connection with the Subsidy Theft and FlexPay Fraud Schemes, Defendants knowingly aided and enabled distributors and/or sellers of their products and services to market them to members of the general public in a way that infringes the T-Mobile Marks by placing in the hands of distributors and/or sellers an instrument of consumer deception.

65.     Defendants' unlawful, unauthorized, and unlicensed sale of unlocked T-Mobile Prepaid Phones, illicitly-acquired T-Mobile codes and service, and fraudulently activated T-Mobile SIM cards has contributed to the creation of express and implied misrepresentations that the products, activated for use on the T-Mobile FlexPay service or to be used in the

fraudulent activation of such, as sold by Defendants, were created, authorized or approved by T-Mobile, and include warranties.

66.     Defendants' conduct leads to post-sale confusion by causing consumers who purchase the products and services from Defendants to believe that they are purchasing legitimate T-Mobile products approved by T-Mobile and containing original warranties and the specified amount of included airtime.

67.     Defendants' conduct constitutes contributory infringement in violation of the Trademark Act.  Defendants' conduct is intentional, malicious, and willful.

## COUNT THREE

### TRAFFICKING IN COMPUTER PASSWORDS
### 18 U.S.C. § 1030(a)(6)

T-Mobile reasserts and incorporates the factual allegations set forth above as though fully set forth herein.

68.     As reflected in Defendant Boyle's email at **Exhibit B**, to fraudulently activate SIM cards on and access T-Mobile's FlexPay service, Defendants and/or their co-conspirators connect to T-Mobile's activation system.  Access to T-Mobile's activation system requires the entry of confidential codes and identifiers, which are entered through a protected internet connection or provided to a T-Mobile customer service representative.

69.     T-Mobile directs its retailers to keep confidential the codes and identifiers necessary to activate T-Mobile SIM cards on T-Mobile's FlexPay service.

70.     Defendants, knowingly and with the intent to defraud T-Mobile, improperly obtain and transfer the confidential activation codes and, without authorization, cause the improperly obtained/transferred codes to be entered into the T-Mobile computer system for the purpose of fraudulently activating SIM cards.  Defendants have transferred these confidential activation codes

as well as a detailed description on how to use the codes to maximize the fraud perpetrated against T-Mobile to various co-conspirators around the country.

71.     The fraudulently-activated SIM cards – which act as a gateway for access to T-Mobile's telecommunications network – are advertised and sold to the public over the internet and around the country as legitimately-activated T-Mobile SIM cards.

72.     Defendants' activities substantially affect interstate commerce and communication in that the confidential codes, fraudulent scheme, and SIM cards are trafficked over the internet and throughout the United States, and T-Mobile's computer system and telecommunications network are used in and affect interstate commerce and communication.

73.     Defendants' fraudulent access and trafficking in T-Mobile's computer codes has caused and will continue to cause T-Mobile to suffer irreparable injury, with damages substantially in excess of $5,000 over a one-year period.

74.     Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

75.     Defendants' conduct is intentional, malicious and willful.

76.     T-Mobile is entitled to appropriate relief as prayed for hereinafter, including injunctive relief and damages.

## COUNT FOUR

### UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD
### 18 U.S.C. § 1030(a)(4)

T-Mobile reasserts and incorporates the factual allegations set forth above as though fully set forth herein.

77.     T-Mobile protects access to its computer network by requiring confidential codes and identifiers to activate T-Mobile SIM cards on the FlexPay plan.

78.     T-Mobile protects access to its telecommunications network by requiring a validly activated SIM card.

79.     In addition to illicitly acquiring T-Mobile SIM cards through their Subsidy Theft Scheme, Defendants and/or their co-conspirators improperly obtain and sell confidential codes and identifiers necessary to activate T-Mobile SIM cards on T-Mobile's FlexPay service.

80.     Posing as legitimate T-Mobile dealers, Defendants knowingly access T-Mobile's proprietary activation system, without authorization, by providing an improperly obtained activation code and fraudulent information about the "customer" for whom the T-Mobile FlexPay plan is to be activated.  **See Exhibit B**.  Defendants use the improperly activated SIM card to fraudulently access T-Mobile's telecommunications network.

81.     In addition to selling illegally-obtained T-Mobile activation codes to the public, after fraudulently accessing the T-Mobile computer system and illegally activating SIM cards, Defendants sell the T-Mobile SIM cards and illegally-obtained airtime, and falsely advertise them to the public as authentic T-Mobile SIM cards for use on T-Mobile's FlexPay service.

82.     Defendants' activities substantially affect interstate commerce and communication in that the confidential codes and SIM cards are trafficked over the internet and throughout the United States, and T-Mobile's computer system and telecommunications network are used in and affect interstate commerce and communication.

83.     Defendants' unauthorized access of T-Mobile's proprietary computer system and telecommunications network has caused and will continue to cause T-Mobile to suffer irreparable injury, with damages substantially in excess of $5,000 over a one-year period.

84.     Defendants' activities constitute unauthorized access with intent to defraud in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

85.     Defendants' conduct is intentional, malicious and willful.

86.     T-Mobile is entitled to appropriate relief as prayed for hereinafter, including injunctive relief and damages.

## COUNT FIVE

### THEFT OF COMPUTER DATA
### 18 U.S.C. § 1030(a)(2)(C)

T-Mobile reasserts and incorporates the factual allegations set forth above as though fully set forth herein.

87.     T-Mobile protects access to its computer network by requiring confidential codes and identifiers to activate T-Mobile SIM cards on T-Mobile plans.  T-Mobile protects access to its telecommunications network by requiring validly-activated SIM cards.

88.     Defendants and/or their co-conspirators improperly obtain these confidential codes and identifiers and, without authorization, access the T-Mobile computer system to activate the SIM cards on T-Mobile's FlexPay service and sell the codes and the scheme to others to do the same.  The fraudulently-activated SIM cards are then used to improperly access or provide access to the T-Mobile telecommunications network and to steal airtime from that network.

89.     After fraudulently accessing the T-Mobile computer system and illegally activating the SIM cards, Defendants sell the T-Mobile SIM cards and illegally-obtained airtime, as well as the activation codes, and falsely advertise them to the public as legitimate T-Mobile FlexPay products and service.

90.     Defendants' activities substantially affect interstate commerce and communication in that the SIM cards and passwords are trafficked over the internet and

throughout the United States, and T-Mobile's computer system and telecommunications network are used in and affect interstate commerce and communication.

91.     Defendants' improper access to T-Mobile's computer system and telecommunications network has caused and will continue to cause T-Mobile to suffer irreparable injury, with damages substantially in excess of $5,000 over a one-year period.

92.     Defendants' activities constitute theft of computer data in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C).

93.     Defendants' conduct is intentional, malicious and willful.

94.     T-Mobile is entitled to appropriate relief as prayed for hereinafter, including injunctive relief and damages.

## COUNT SIX

### UNAUTHORIZED ACCESS
### 18 U.S.C. § 1030(a)(5)(C)

T-Mobile reasserts and incorporates the factual allegations set forth above as though fully set forth herein.

95.     T-Mobile protects access to its computer network by requiring confidential codes and identifiers to activate T-Mobile SIM cards on T-Mobile plans.

96.     T-Mobile protects access to its telecommunications network by requiring validly-activated SIM cards.

97.     Defendants and/or their co-conspirators improperly obtain these confidential computer codes and identifiers and, without authorization, intentionally access the T-Mobile computer system to activate the SIM cards on T-Mobile's FlexPay service and sell the codes and identifiers to others to do the same.  Defendants use the SIM cards and codes to intentionally and

improperly access or provide access to the T-Mobile telecommunications network and to steal airtime from that network.

98.     After fraudulently accessing the T-Mobile computer system and telecommunications network, Defendants resell the T-Mobile SIM cards, codes, and illegally-obtained airtime, and falsely advertise them to the public as authentic T-Mobile FlexPay products and service.

99.     Defendants' activities substantially affect interstate commerce and communication in that the SIM cards and passwords are trafficked over the internet and throughout the United States, and T-Mobile's computer system is used in and affects interstate commerce and communication.

100.    Defendants' misappropriation of T-Mobile's confidential computer codes, airtime, and trademarks, and improper access of T-Mobile's computer system and telecommunications network, have caused and will continue to cause T-Mobile to suffer irreparable injury, including impairment of the integrity of T-Mobile's protected computer and telecommunications networks, and damages substantially in excess of $5,000 over a one-year period.

101.    Defendants' activities constitute unauthorized computer access resulting in damage, in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

102.    Defendants' conduct is intentional, malicious and willful.

103.    T-Mobile is entitled to appropriate relief as prayed for hereinafter, including injunctive relief and damages.

## COUNT SEVEN

## COMMON LAW FRAUD

T-Mobile reasserts and incorporates the factual allegations set forth above as though fully set forth herein.

104.    As part of their FlexPay Fraud Scheme, Defendants regularly and systematically use confidential internal T-Mobile computer codes to access T-Mobile's proprietary activation computer system over the internet or through T-Mobile representatives over the telephone.  In so doing, Defendants misrepresent to T-Mobile, on an ongoing basis, that they are authorized T-Mobile dealers properly activating a T-Mobile SIM card for use on T-Mobile's FlexPay service.

105.    Defendants know that they are not authorized to activate T-Mobile SIM cards in the manner described herein.

106.    Defendants intend for T-Mobile to rely on their misrepresentations so as to activate the T-Mobile SIM cards for use on T-Mobile's FlexPay service.

107.    T-Mobile's reliance on Defendants' misrepresentations is reasonable as Defendants present the confidential codes and identifiers necessary for the legitimate activation of T-Mobile SIM cards on the FlexPay system.

108.    T-Mobile has been and continues to suffer damages as a result of Defendants' actions.

## COUNT EIGHT

### VIOLATION OF THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT
### 815 ILCS 510/1 *et seq*

T-Mobile reasserts and incorporates the factual allegations set forth above as though fully set forth herein.

109.    Defendants misrepresent to T-Mobile and the public that they are authorized by T-Mobile and are properly trading in legitimate T-Mobile products and FlexPay service.

110.    Defendants have used and are using the T-Mobile Marks in connection with the above-described Subsidy Theft and FlexPay Fraud Schemes in such a manner as to misrepresent the source, sponsorship, approval, and/or certification of their products and services.

111.   The use of the T-Mobile Marks by the Defendants creates the unreasonable risk that users may falsely conclude that there exists some affiliation, connection, or association between and among T-Mobile and Defendants.

112.   Defendants' acts have damaged, impaired, and diluted that part of T-Mobile's goodwill and good name symbolized by the above-noted names and mark.  The nature, probable tendency, and effect of Defendants' use of these names and properties in the manner alleged are to enable Defendants to deceive the public.

113.   Defendants' use of T-Mobile's name and Marks in its Subsidy Theft and FlexPay Fraud Schemes constitutes unfair competition as prohibited by the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*

114.   Defendants had actual knowledge of T-Mobile's rights at the time they decided to use the T-Mobile Marks in connection with their Subsidy Theft and FlexPay Fraud Schemes. Thus, Defendants willfully and deliberately infringed upon T-Mobile's rights.

115.   Defendants' unfair business practices are of a recurring nature and harmful to the consumers and the public at large, as well as T-Mobile.  These practices constitute unlawful, unfair, and fraudulent business practices and unfair, deceptive, untrue, and misleading advertising.

116.   As a result of Defendants' acts, T-Mobile has suffered and continues to suffer and incur irreparable injury, loss of reputation, and pecuniary damages to be proved at trial.  Unless enjoined by this Court, Defendants will continue these acts, thereby causing T-Mobile further immediate and irreparable damage.

## COUNT NINE

## CIVIL CONSPIRACY

T-Mobile reasserts and incorporates the factual allegations set forth above as though fully set forth herein.

117.   An agreement and conspiracy existed and continues to exist between and among Defendant Ryan Boyle and his co-conspirators to unlawfully bulk purchase, traffic, and resell unlawfully unlocked and altered T-Mobile Prepaid Phones and SIM cards, and to acquire confidential and proprietary T-Mobile activation codes and passwords, to fraudulently activate the SIM cards on T-Mobile's FlexPay service, and/or falsely advertise and sell those SIM cards to the public under the T-Mobile Marks, as well as to sell the highly confidential proprietary codes and passwords to access T-Mobile's computers to steal airtime, which results in Federal Trademark Infringement and False Advertising; Contributory Trademark Infringement; Trafficking in Computer Passwords, 18 U.S.C. § 1030(A)(6); Unauthorized Access With Intent To Defraud, 18 U.S.C. § 1030(A)(4); Theft Of Computer Data, 18 U.S.C. § 1030(A)(2); Unauthorized Access Resulting In Computer Damage, 18 U.S.C. § 1030(A)(5)(C); Common Law Fraud; violation of the Illinois Deceptive Trade Practices Act; Unjust Enrichment; and Tortious Interference With Prospective Economic Advantage.

118.   Defendants knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy as set forth with more particularity in this Complaint.

119.   T-Mobile has been proximately damaged by the conspiracy and Defendants' actions in furtherance thereof.

## COUNT TEN

### UNJUST ENRICHMENT

T-Mobile reasserts and incorporates the factual allegations set forth above as though fully set forth herein.

120.   Through their participation in the Subsidy Theft Scheme, as well as by selling large quantities of fraudulently-activated T-Mobile SIM cards for use on the T-Mobile network without any payment or remuneration to T-Mobile, as well as the confidential and proprietary

codes for activation and the process to defraud T-Mobile out of airtime and legitimate customers, Defendants have obtained substantial benefits from T-Mobile resulting in significant financial gain to the Defendants.

121.    Defendants have acquired the benefits voluntarily and with full knowledge of the benefits.

122.    Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying T-Mobile the value of the benefits Defendants' acquired.

## COUNT ELEVEN

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

T-Mobile reasserts and incorporates the factual allegations set forth above as though fully set forth herein.

123.    A business relationship, and an expectancy of business relationships, exists between T-Mobile and authorized T-Mobile dealers and retailers.

124.    A business relationship, and an expectancy of business relationships, exists between T-Mobile and the purchasers and prospective purchasers of its prepaid products, including the T-Mobile FlexPay service.

125.    There is a high probability of future economic benefit to T-Mobile as a result of these current and prospective business relationships.

126.    Defendants have knowledge of and are intentionally and unjustifiably interfering with, and/or have knowingly facilitated a conspiracy to interfere with, these current and prospective business relationships between T-Mobile, authorized retailers who sell T-Mobile products, and legitimate T-Mobile customers through improper means and in violation of the law.

127.    Defendants engaged in these acts of interference with a conscious desire to prevent the relationships from occurring, or Defendants knew that the interference was certain or substantially certain to occur as a result of their conduct.

128.    T-Mobile has been proximately damaged and continues to be damaged as a result of Defendants' interference.

## COUNT TWELVE

### CONVERSION

T-Mobile reasserts and incorporates the factual allegations set forth in paragraphs above as though fully set forth herein.

129.    T-Mobile has the right to provide its Phones and FlexPay service to the public. Defendants have no such privilege or right.

130.    Defendants knew or should have known that T-Mobile is the exclusive licensee of the T-Mobile Marks and that Defendants had no legal right to use the T-Mobile Marks on their infringing products and services.

131.    Defendants knew or should have known that T-Mobile is the rightful owner of the airtime sold on or through its network and that Defendants had no legal right to sell airtime on T-Mobile's network.

132.    Defendants are wrongfully interfering with T-Mobile's rights by engaging in the Subsidy Theft and FlexPay Fraud Schemes.

133.    Defendants' conduct has resulted in substantial harm to T-Mobile as more particularly set forth above.

### DEMAND FOR JURY TRIAL

T-Mobile demands a trial by jury on all triable issues.

WHEREFORE, Plaintiff, T-Mobile USA, Inc., respectfully requests that this Court enter final judgment and injunctive relief in favor of T-Mobile and against Defendants, as follows:

a.   awarding T-Mobile its compensatory, consequential, statutory and special damages including, without limitation, its lost profits, Defendants' profits, loss of goodwill and damage to its reputation, as well as exemplary damages, together with pre and post judgment interest, as provided by law;

b.   awarding T-Mobile its reasonable attorneys' fees and costs associated with this action;

c.   awarding T-Mobile permanent injunctive relief against Defendants, enjoining Defendants from engaging in the unlawful practices described in this Complaint;

d.   requiring Defendants, pursuant to the Lanham Act, to deliver their entire inventory of Phones and SIM cards bearing or infringing the T-Mobile Marks or a confusingly similar copy thereof; and

e.   granting such further relief as this Court deems just and proper.

Respectfully submitted on June 21, 2010

By:   /s/James B. Baldinger
      James B. Baldinger
      Florida Bar No. 869899
      Stacey K. Sutton
      Florida Bar No. 289530
      *Admission pro hac vice pending*
      CARLTON FIELDS, P.A.
      Email:  jbaldinger@carltonfields.com
              ssutton@carltonfields.com


By:   /s/Lawrence H. Heftman
      Lawrence H. Heftman
      Charles H.R. Peters
      SCHIFF HARDIN LLP
      233 South Wacker Drive
      Suite 6600
      Chicago, IL 60606
      (312) 258-5500
      Email:  lheftman@schiffhardin.com
              cpeters@schiffhardin.com

      Attorneys for T-Mobile USA, Inc.